DECISION
{¶ 1} In this original action, relator, Gary A. Miller, seeks a writ of mandamus compelling respondent, the Industrial Commission of Ohio, to vacate its order denying relator's application for the alleged loss of use of his left hand, R.C. 4123.57(B), and enter a new order that grants relator's application.
 {¶ 2} The matter was referred to a magistrate of this court pursuant to Civ.R. 53(C), and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision that includes findings of fact and conclusions of law and recommended that this court deny the requested writ of mandamus. (Attached as Appendix A.) No objection has been filed to the magistrate's decision.
 {¶ 3} Pursuant to Civ.R. 53(E)(4), the court conducted a full review of the magistrate's decision. The court finds that there is no error of law or other defect upon the face of the decision. Therefore, the court adopts the magistrate's decision as its own and the requested writ of mandamus is denied.
Writ of mandamus denied.
Sadler and McGrath, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Gary A. Miller, :
 Relator, :
v. : No.
05AP-214 Ohio Industrial Commission and : (REGULAR CALENDAR)
Fluor Constructors International, :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on September 16, 2005 J.B. Marshall, Jr., for relator.
Jim Petro, Attorney General, and Dennis L. Hufstader, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 4} In this original action, relator, Gary R. Miller, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying his motion for an R.C.4123.57(B) scheduled-loss award for an alleged loss of use of his left hand, and to enter an award for a total loss of use of his left hand.
Findings of Fact:
 {¶ 5} 1. On August 22, 2004, relator sustained an industrial injury while employed as a pipe fitter for respondent Fluor Constructors International, a state-fund employer. The injury occurred when relator was getting up from a lunch table and fell onto his outstretched left hand. The industrial claim is allowed for "fracture left carpal bone, closed; other postoperative infection, left; fracture left distal radius," and is assigned claim number 02-416290.
 {¶ 6} 2. On August 28, 2002, relator underwent an "[o]pen reduction internal fixation bone graft, application of external fixation device left radius." The surgery was performed by George K. Aitken, M.D. According to Dr. Aitken's operative report, the preoperative and postoperative diagnoses were "[c]omminuted fracture left distal radius."
 {¶ 7} 3. On May 20, 2003, physical therapist David Kazee conducted a "Functional Capacity Evaluation" ("FCE"). Mr. Kazee reported:
The patient's Physical Demand Classification is light-medium:
Light-Medium
 Occasional 35 lbs.
 Frequent 15 lbs.
 Constant 5 lbs.
 Stand/walk

* * *
Restriction use by the patient is basically any significant left upper extremity use. The patient can do no reaching overhead with the left upper extremity, no crawling and no pulling or pushing with the left upper extremity. He is basically restricted from any occupation that requires left upper extremity use. The patient can drive a family type vehicle but I doubt he can drive a commercial vehicle requiring a lot of heavy turning. At this point, the patient has difficulty getting hand in position that he can turn a steering wheel safely. The patient is not to do any overhead reaching or crawling or pulling with the left upper extremity. * * * His left upper extremity is probably at maximum improvement.
It should also be noted that the patient's job as a pipe fitter is [in] the heavy classification:
 Heavy
 Occasional 100 lbs.
 Frequent 50 lbs.
 Constant 20 lbs.

He cannot meet these demands. * * *
* * *
ASSESSMENT: From the Musculoskeletal Evaluation the patient is status post fusion of left wrist. He is now presenting with a permanent loss of extension. His wrist is in a flexed position, which is probably not the best position to have a fusion. He has lost significant range of motion of his left hand and fingers and left upper extremity in general, still has significant weakness throughout the left upper extremity. I feel like these deficits are probably permanent and will not improve over what they currently are. There was no symptom magnification or symptom exaggeration demonstrated by this patient during the Musculoskeletal Evaluation.
* * *
Comments: The patient's left hand is basically not useable for working activities. He has to compensate with his trunk and shoulder to get into positions to be able to use his hands. We allowed the patient to be tested in comfortable positions, which are not really functional positions. In short, due to his wrist being in a permanent flexed position and lacking supination and pronation he has to compensate with his shoulder and trunk, which is eventually going to lead to other musculoskeletal problems. His inability to manipulate fine objects rules him out for being good on any type of assembly. The patient had significant increase in hand discomfort, but considering his pathology, this would be considered normal.
* * *
* * * The patient's job demand as a pipe fitter is in the heavy category to very heavy category for Physical Demand Classification. He is unable to do this and it is the personal opinion of this evaluator that he will never [be] able to do this again. It is also the opinion of this evaluator that the light-medium category this patient is currently in is probably his maximum classification achievement. It also must be noted that this patient is limited to minimal to no use with the left upper extremity. Light-medium category is what his body and right upper extremity are capable of doing [at] this time.
 {¶ 8} On July 30, 2003, relator moved for R.C. 4123.57(B) scheduled-loss compensation for an alleged loss of use of his left hand. In support, relator submitted a report, dated June 3, 2003, from Dr. Aitken:
* * * He continues to have problems with his wrist. It's uncomfortable most of the time but if he uses it to any significant degree then it will become quite painful. His range of motion has not significantly changed. He's not having any significant numbness or tingling and he's had no evidence of recurrent infection.
He had his FCE which rates him as able to do light to medium activity.
Xrays were obtained today and these show severe arthritic change within the wrist, no evidence of recurrent infection.
In spite of his FCE, I don't believe he has any significant realistic chance to rejoin the work force. This is based upon the severity of his injury, his inability to use his left hand for any significant activity, his age and training.
I believe he is at MMI. I do believe he will likely come to a wrist fusion in the future. Because this is all related to his original injury and treatment thereof, I do believe this would also [be] considered to be compensable.
Since he has in essence a wrist fusion with angleosis [sic] of the wrist at 20 degrees of flexion, 10 degrees of radial deviation.
Using the AMA Guide to Permanent Impairment, 5th Edition, Figure 16-28, 16-31 and Table 16-3, he has a 35% upper extremity impairment which is equivalent to a 21% whole person impairment. I believe this is solely related to his injury and does not have any element of previous problems or part of a normal aging process.
 {¶ 9} On October 2, 2003, at the request of the Ohio Bureau of Workers' Compensation ("bureau"), Robert Brown, M.D., reviewed the commission's file and reported:
Allowed conditions are accepted as [a] result of [a] fall that fractured [the left] wrist. Had surgical fixation of fracture and developed an infection requiring 6 week[s] of intravenous antibiotics [and] surgical debridements. IW [injured worker] had physical therapy * * *. [N]oted to have stiffness in wrist [and] fingers. 2/21/03 has a 25# grip; 6/3/03 xrays shows fracture healed with slight dorsal angulation. Dr. Aitken found a 21% IWP [impairment whole person].
* * * Based on information in file, IW has a 21% IWP — this is not consistent with total loss of use of hand.
 {¶ 10} On October 30, 2003, relator was examined, at the employer's request, by Helen M. O'Donnell, M.D. Dr. O'Donnell reported:
* * * The force of the fall was associated with a closed fracture of the left wrist. The x-ray report on the day after injury described a comminuted intra-articular fracture involving the distal radius with mild impaction and dorsal tilt of the articular surface of the distal radius. Noted at that time was moderate to severe osteoarthritis involving the first trapeziometacarpal joint. The patient underwent ORIF [open reduction internal fixation] 08/28/02, which involved pin insertion, bone grafting and application of EF [external fixation] at King's Daughters' Medical Center. Postoperative film showed osteoarthritic change in the first digit from the trapezium to the distal phalanx, including significant osteophyte formation at the IP joint of the thumb. The procedure was complicated by wound infection with S. Aureus; readmission for IV [intravenous] antibiotics, wound debridement, removal of bone graft, and insertion of antibiotic beads was required. After discharge, Mr. Miller continued treatment with IV antibiotics administered at home under supervision of ID, by his estimate, 6 weeks. This was followed by oral antibiotic therapy. At 7 weeks post op, EF was removed and PT [physical therapy] intiated.
Current complaints include pain in the left wrist and hand increased with use, numbness around the scars, over the thumb and in the fingers, index and ring fingers. In spite of numbness, he has pain dysesthesia to touch and to heat, as with hot water on the hand. Other complaints include de-creased grasp, decreased dexterity. The pain is "excruciating" with use, brings him to tears. At rest, there is a dull ache. Intensity is graded from 2/10 to 10/10 with pulling, for instance.
All these signs and symptoms affect function; Mr. Miller reports he is independent in dressing and grooming with loose clothing with his right hand. He helps with light house-keeping using one hand; this includes loading the dishwasher, folding clothes, loading the washer from hampers in the room. He cannot carry loads. The patient is independent in use of the riding lawnmower, but cannot trim with a "weedeater".
Medication use is OTC pain medication; although he has [been] prescribed narcotic analgesia, he does not like side effects and only uses for severe exacerbation of pain.
Review of therapy notes suggests this patient gave good effort and was an active participant in his own therapy program. In spite of extensive treatment and good effort, wrist range never reached goals set, but, in fact, decreased over time with fusion into flexion and ulnar deviation. Maximum wrist extension was 12 degrees passively 11/22/02. Dr. Aitken's notes document a flare of pain and inflammation in March 2003. At the time of functional capacity evaluation, May 20, 2003, the left wrist was described as fused into flexion of 20 degrees. The assessment was that Mr. Miller had significant impairment of the left arm involving primarily range of the wrist, but also affecting range of forearm pronation, supination, strength of hand grip, pinch and sensa-tion. It was offered that the impairments documented would be associated with disabilities in 2 handed tasks such as material lifting, material handling, even crawling. Right upper extremity, trunk and lower extremities were normal.
Mr. Miller reports his surgeon advised him that a wrist fusion might be considered in the future.
The Comprehensive Vocational Assessment suggested Mr. Miller had the intellectual and academic abilities to function in entry-level clerical positions, counter clerk, and sales occupa-tions at the sedentary to light-medium level. It was suggested that earning a GED and improving math skills would help him to participate in technical college level training.
* * *
PHYSICAL EXAM:
* * * On the left, the wrist was fixed in 30 degrees flexion; there was no passive or active range elicited. Attempts at passive range were painful. At rest the left wrist was also in a posture of ulnar deviation 20 degrees; no active range could be demonstrated. Attempts at passive range were painful and did not move the wrist. On the left MCP [metacarpo-phalangeal] extension was full; maximum MCP flexion was 40 at the thumb and 80 at digits 2-5. Left thumb IP [inter-phalangeal] flexion was quite limited at 10 degrees; this could not be increased passively. Left finger PIP [proximal inter-phalangeal] flexion was 70 degrees active and passive. DIP [distal interphalangeal] flexion was limited to less than 40 degrees. Because of these flexion limits and abnormal wrist posture, the thumb could not be brought into apposition to the finger pads. The thumb could be adducted against the index finger to produce a pinch.
Xrays provided by the patient were reviewed. There is com-plete loss of the wrist joint space.
 {¶ 11} Following a January 21, 2004 hearing, a district hearing officer ("DHO") issued an order denying relator's motion for a loss of use award. The DHO's order states:
The District Hearing Officer finds the injured worker had not established that he sustained a total loss of use of his left hand, pursuant to O.R.C. 4123.57(B).
Accordingly, his request for a total loss of use award is denied.
The medical evidence does not establish that the injured worker suffers from contractures and/or ankylosis to such an extent as to render his left hand as useless as if it were amputated.
In fact, the reports of Drs. O'Donnell, 10/30/2003, Aitken, 06/30/2003, Brown, 10/02/2003 and the Functional Capacity Evaluation of 05/20/2003 all indicate the injured worker still has some use of the hand.
 {¶ 12} Relator administratively appealed the DHO order of January 21, 2004.
 {¶ 13} 9. Following a March 2, 2004 hearing, a staff hearing officer ("SHO") issued an order stating:
The order of the District Hearing Officer, from the hearing dated 01/21/2004, is Affirmed with additional reasoning.
After reviewing all of the evidence on file, it is the order of the Staff Hearing Officer that the injured worker's motion, filed 07/30/2003 is denied.
The injured worker has failed to show that he has total loss of use of his hand. Functionally used does not equal total loss of use of the hands [sic].
The injured worker demonstrated that he has movements in his hand. He is able to move his fingers.
Staff Hearing Officer also notes [in] Dr. Aitken['s] report where he noted "thumb could be adducted against the index finger to produce a pinch" (08/28/2002).
 {¶ 14} On March 27, 2004, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of March 2, 2004.
 {¶ 15} 11. On March 3, 2004, relator, Gary R. Miller, filed this mandamus action.
Conclusions of Law:
 {¶ 16} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 17} R.C. 4123.57(B) provides for compensation for scheduled losses:
If the claimant has suffered the loss of two or more fingers by amputation or ankylosis and the nature of the claimant's employment in the course of which the claimant was working at the time of the injury or occupational disease is such that the handicap or disability resulting from the loss of fingers, or loss of use of fingers, exceeds the normal handicap or disability resulting from the loss of fingers, or loss of use of fingers, the administrator may take that fact into consideration and increase the award of compensation accordingly, but the award made shall not exceed the amount of compensation for loss of a hand.
For the loss of a hand, one hundred seventy-five weeks.
 {¶ 18} Two cases cited by relator are instructive. Both cases will be extensively discussed here.
 {¶ 19} In State ex rel. Alcoa Building Products v. Indus. Comm.,102 Ohio St.3d 341, 342-343, 2004-Ohio-3166, at ¶ 10, the court succinctly set forth the historical development of scheduled awards for loss of use under R.C. 4123.57(B). The Alcoa court states:
Scheduled awards pursuant to R.C. 4123.57(B) compensate for the "loss" of a body member and were originally confined to amputations, with the obvious exceptions of hearing and sight. In the 1970's, two cases — Stateex rel. Gassmann v. Indus. Comm. (1975), 41 Ohio St.2d 64, * * * andState ex rel. Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402, * * * — construed "loss," as similarly used in R.C. 4123.58, to include loss of use without severance. Gassmann and Walker both involved paraplegics. In sustaining each of their scheduled loss awards, we reasoned that "[f]or all practical purposes, relator has lost his legs to the same effect and extent as if they had been amputated or otherwise physically removed."Gassmann, 41 Ohio St.2d at 67 * * *; Walker, 58 Ohio St.2d at 403-404[.] * * *
 {¶ 19} In Alcoa, the claimant sustained a left arm amputation just below the elbow. Continuing hypersensitivity at the amputation site prevented the claimant from ever wearing a prosthesis. Consequently, the claimant moved for a scheduled-loss award for loss of use of his left arm.
 {¶ 20} Alcoa established through a videotape that the claimant could use his remaining left arm to push open a car door and to tuck paper under the arm. Nevertheless, the commission granted the claimant an award for the loss of use of his left arm.
 {¶ 21} This court denied Alcoa's complaint for a writ of mandamus and Alcoa appealed as of right to the Supreme Court of Ohio.
 {¶ 22} Affirming this court's judgment and upholding the commission's award, the Alcoa court explained, at ¶ 10-15:
* * * Alcoa urges the most literal interpretation of this rationale and argues that because claimant's arm possesses some residual utility, the standard has not been met. The court of appeals, on the other hand, focused on the opening four words, "for all practical purposes." Using this interpretation, the court of appeals found that some evidence supported the commission's award and upheld it. For the reasons to follow, we affirm that judgment.
Alcoa's interpretation is unworkable because it is impossible to satisfy. Walker and Gassmann are unequivocal in their desire to extend scheduled loss benefits beyond amputation, yet under Alcoa's interpretation, neither of those claimants would have prevailed. As the court of appeals observed, the ability to use lifeless legs as a lap upon which to rest a book is a function unavailable to one who has had both legs removed, and under an absolute equivalency standard would preclude an award. And this will always be the case in a nonseverance situation. If nothing else, the presence of an otherwise useless limb still acts as a counterweight — and hence an aid to balance — that an amputee lacks. Alcoa's interpretation would foreclose benefits to the claimant who can raise a mangled arm sufficiently to gesture or point. It would preclude an award to someone with the hand strength to hold a pack of cards or a can of soda, and it would bar — as here — scheduled loss compensation to one with a limb segment of sufficient length to push a car door or tuck a newspaper. Surely, this could not have been the intent of the General Assembly in promulgating R.C. 4123.57(B) or of Gassmann and Walker.
Pennsylvania defines "loss of use" much as the court of appeals did in the present case, and the observations of its judiciary assist use here. In that state, a scheduled loss award requires the claimant to demonstrate either that the specific bodily member was amputated or that the claimant suffered the permanent loss of use of the injured bodily member for all practical intents and purposes. Discussing that standard, one court has written:
"Generally, the `all practical intents and purpose' test requires a more crippling injury than the `industrial use' test in order to bring the case under section 306(c), supra. However, it is not necessary that the injured member of the claimant be of absolutely no use in order for him to have lost the use of it for all practical intents and purposes."Curran v. Walter E. Knipe Sons, Inc. (1958), 185 Pa.Super. 540, 547,138 A.2d 251.
This approach is preferable to Alcoa's absolute equivalency standard. Having so concluded, we further find that some evidence indeed supports the commission's decision. Again, Dr. Perkins stated:
"It is my belief that given the claimant's residual hyper-sensitivity, pain, and tenderness about his left distal forearm, that he is unable to use his left upper limb at all and he should be awarded for the loss of use of the entire left upper limb given his symptoms. He has been given in the past loss of use of the hand, but really he is unable to use a prosthesis since he has had the amputation, so virtually he is without the use of his left upper limb * * *."
 {¶ 23} In State ex rel. Timmerman Truss, Inc. v. Indus. Comm.,102 Ohio St.3d 244, 2004-Ohio-2589, the court granted a writ of mandamus in favor of the employer when the commission had granted a loss of use award in reliance upon doctors' reports that did not consider the claimant's actual physical abilities with respect to the body part for which loss of use was being sought.
 {¶ 24} In Timmerman, the commission award for loss of use of the right hand was based upon the March 11, 2002 medical file review of Dr. Gibson and Dr. Bamberger's April 22, 2002 letter.
 {¶ 25} The Timmerman court found that the reports of both doctors were seriously flawed. Dr. Bamberger's report was held to be flawed because it raised questions as to the author's awareness of "(1) the Walker standard of loss and (2) claimant's post-recovery activities."[1] Timmerman, at ¶ 25. The Timmerman court explains:
* * * Nothing in Dr. Bamberger's report indicates that the claimant's degree of loss is the functional equivalent of an amputation. He instead recites the claimant's history without discussing his current functional residuals and bases his loss-of-use assessment on claimant's employment history and the fact that the dominant hand is involved.
Id.
 {¶ 26} With respect to Dr. Gibson's file review, the Timmerman court, at ¶ 29, states that Dr. Gibson "appears to be more cognizant of theWalker loss standard." The Timmerman court, at ¶ 30, concludes:
Under most circumstances, therefore, Dr. Gibson's report alone would support the commission's award. Here, however, [State ex rel. Schultz v.Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316] demands that the medical assessment be viewed in the context of claimant's postrecovery physical and work activities. * * *
 {¶ 27} Whether we use the so-called Walker standard of loss, i.e., that "for all practical purposes" the claimant has lost the hand to the same effect and extent as if it had been amputated or otherwise physically removed, or we use the Alcoa standard of loss, i.e., that "for all practical intents and purpose" the claimant has suffered the permanent loss of use of the hand, the result is the same. In either case, this magistrate must conclude that there is no evidence in the record upon which the commission could have based an award for loss of use of the hand.
 {¶ 28} Analysis here begins with the DHO's finding: "The medical evidence does not establish that the injured worker suffers from contractures and/or ankylosis to such an extent as to render his left hand as useless as if it were amputated."
 {¶ 29} In Timmerman, the court notes that loss of a hand under R.C.4123.57(B) can be shown under a "flat loss" theory or a "two fingers plus" theory. Timmerman, at ¶ 24.
 {¶ 30} Apparently, the above finding of the DHO is a rejection of a "two fingers plus" theory that relator perhaps presented to the hearing officer.
 {¶ 31} While it is unclear whether relator argued the "two fingers plus" theory before the commission's hearing officers, relator does not seem to posit the theory here in mandamus. In any event, none of the doctors who issued reports in regard to relator's motion opined that relator had lost the use of any of the digits of the left hand due to ankylosis. For example, while Dr. O'Donnell found "left thumb IP flexion was quite limited at 10 degrees" and that "maximum MCP flexion was 40 at the thumb," she did not opine that the left thumb was considered a loss due to ankylosis.
 {¶ 32} Dr. Aitken, relator's surgeon, did not evaluate left digit impairment as did Dr. O'Donnell. Dr. Aitken based his 35 percent impairment rating for the left upper extremity entirely upon the "wrist fusion," noting that the left wrist was "fixed in 30 degrees flexion" and that "attempts at passive range of motion were painful and did not move the wrist."
 {¶ 33} In short, there is no evidence in the record to support a so-called "two fingers plus" theory for a loss of hand award.
 {¶ 34} There is also no evidence in the record to support a "flat loss" theory for loss of a left hand.
 {¶ 35} While Dr. Aitken, in his June 3, 2003 report, referred to relator's "inability to use his left hand for any significant activity," he failed to indicate his awareness of the Walker standard of loss or theAlcoa standard of loss. Thus, under the reasoning set forth in Timmerman
regarding Dr. Bamberger's report, Dr. Aitken's report must be viewed as similarly flawed. There is simply no indication in Dr. Aitken's report that Dr. Aitken understood the standard for determining loss of use.
 {¶ 36} Moreover, physical therapist David Kazee's opinion (to the extent that it is viewed as accepted by Dr. Aitken) that relator's "left hand is basically not usable for working activities" does not meet theWalker or Alcoa standard for loss of use. As the Alcoa court notes, the "all practical intents and purpose" test used by the Pennsylvania courts requires a more crippling injury than the "industrial use" test. Kazee's opinion that relator's "left hand is basically not useable for working activities" applies an "industrial use" test that is not appropriate here.
 {¶ 37} Dr. O'Donnell, who evaluated the industrial injury for the employer, does not opine that relator has suffered the loss of use of the left hand. She, in fact, renders no statement whatsoever that could be viewed as an opinion that relator has lost the use of his left hand. Accordingly, Dr. O'Donnell's report provides no evidence to support relator's motion.
 {¶ 38} Dr. Brown, who conducted a file review for the bureau, opines that the 21 percent impairment rating given by Dr. Aitken is "not consistent with total loss of use of hand." Obviously, Dr. Brown's report provides no evidence supporting an award for loss of use of the left hand.
 {¶ 39} Based upon the above analysis, the magistrate concludes that there is no evidence in the record to support relator's motion for an R.C. 4123.57(B) award for loss of use of his left hand under either the "flat loss" or the "two fingers plus" theory.
 {¶ 40} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
[1] State ex rel. Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402.