DECISION
{¶ 1} Relator, Janet Casey, has filed an original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying relator's motion requesting an award for the *Page 2 
functional loss of use of her lower extremity, and ordering the commission to review the matter and issue an order supported by some evidence.
 {¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny relator's request for a writ of mandamus. (Attached as Appendix A.) No objections have been filed to that decision.
 {¶ 3} Finding no error of law or other defect on the face of the magistrate's decision, this court adopts the magistrate's decision as our own, including the findings of fact and conclusions of law. In accordance with the magistrate's decision, relator's requested writ of mandamus is denied.
Writ of mandamus denied.
 BRYANT and BOWMAN, JJ., concur.
BOWMAN, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 3 
 APPENDIX A MAGISTRATE'S DECISION {¶ 4} Relator, Janet Casey, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio *Page 4 
("commission") to vacate its order which denied her motion requesting an award for the functional loss of use of her left lower extremity and ordering the commission to review the matter de novo and issue an order supported by some evidence after utilizing the proper standard.
Findings of Fact: {¶ 5} 1. Relator sustained a work-related injury on May 24, 2003, when a large can of beans fell off a shelf, struck her left leg and, especially, her left foot. Relator's workers' compensation claim has been allowed for "contusion left foot; contusion left lower leg; reflex sympathetic dystrophy lower limb, left foot."
 {¶ 6} 2. In January 2006, relator filed a motion requesting:
 * * * [P]ursuant to [State ex rel. Alcoa Bldg. Products v. Indus. Comm., 102 Ohio St.3d 341, 2004-Ohio-3166], she be awarded the functional loss of use of her left lower extremity for all practical intents and purposes, rather than the absolute equivalency standard employed with the actual severance of the limb or ankylosis.
Relator attached the following documents to her motion: (1) the August 13, 2004 report of Tom M. Porter, M.D., who had been treating relator and stated: "She * * * failed conservative therapy and because of this, she recently underwent a trial of spinal cord stimulator lead placement. I saw her on followup following this trial on 08/13/04. At that time, she reported an overall 50% reduction in her pain symptoms with this stimulator. This is [the] most profound pain relief she has had since the onset of her pain. Based on her response, she is definitely [a] candidate for a placement of a permanent spinal cord stimulator lead and subcutaneous battery"; (2) the November 3, 2004 operative report from the Morrow County Hospital when relator had a permanent spinal cord *Page 5 
stimulator implanted; (3) an August 26, 2005 report from Laurie Weaver, physical therapist, addressed to Aleksey A. Prok, M.D., requesting a prescription to provide relator with a custom molded brace because relator "is unable to tolerate having her left foot flat on the floor when walking due to her RSD. She is therefore walking on the lateral border of her left foot. I feel that a custom molded brace for her left lower extremity is necessary to distribute the weight bearing load. This may enable her to maintain her ability to use ambulation as a primary means of mobility"; (4) a prescription from Dr. Prok requesting the custom molded brace; and (5) the November 25, 2005 report of Dr. Prok wherein he stated:
 [One] Do I feel that Ms. Casey has developed a functional loss of use of left lower extremity as a direct result of the original work injury?
 The answer is yes, I believe she did lose some functionality in her left lower extremity but I am not able to estimate what the percentage would that be.
 [Two] Do I feel that reflex sympathetic dystrophy impairs her abilities?
 Yes I do. I do feel that reflex sympathetic dystrophy directly impairs her ability to perform many daily activities of daily living.
 [Three] I do believe functional loss of use in her left lower extremity is directly attributable to the work related injury and the allowed condition in claim. And again, I cannot estimate what the percentage of loss.
 [Four] In drawing my conclusions, I paid attention to history of the development of disease of presenting symptoms and considering all that I do believe that the patient has reflex sympathetic dystrophy which is an allowed diagnosis and this disease is very well known to impair patients abilities to function and impairability to adequate[ly] perform activity of daily living. *Page 6 
 {¶ 7} 3. In January 2006, Alan R. Kohlhaas, M.D., performed an independent medical examination. At the outset of his report, Dr. Kohlhaas stated:
 Ms. Casey is a 49 year-old lady being seen at the request of the Mansfield BWC for a "loss of use" exam, function loss, use of left lower extremity for all intents and purposes rather then the absolute standard employed with the actual severance of a limb or ankylosis. * * *
In the physical examination section of his report, Dr. Kohlhaas stated:
 * * * On physical examination I find an adult female, who is alert, standing 4'11" tall, weighing 180 pounds. Normal pressure on her foot caused pain and therefore range of motion and strength could not be determined in her foot and ankle, which was being held in inversion type position, which was held in this brace. On general observation there is no sign of any type of shiny skin or swelling in her foot. On leaving she was able to ambulate to the vehicle, with no sign of hesitancy of putting or full weight bearing on her left leg.
Thereafter, Dr. Kohlhaas stated:
 * * * Per the request for loss of use, as stated, she does have difficultly above and beyond the usual impairment of this extremity from the allowed conditions. This amount though is minimal and is 5% of her left lower extremity. This converts to a 2% whole person loss of use impairment.
 {¶ 8} 4. Following the examination by Dr. Kohlhaas, relator was examined by Richard M. Ward, M.D., who issued a report in May 2006. At the outset of his report, Dr. Ward noted the following: "On 11-3-04 she had a surgical procedure done which was the implantation of a spinal cord stimulator; this did not help her." Thereafter, he noted his physical findings upon examination:
 * * * On examination she ambulates using a walker with wheels. She has bilateral forearm supports so that she can avoid any pressure on her left foot. She has a protective devise that she wears on the left foot. With it removed she *Page 7 
has a marked varus deformity of her left foot. She has no effective ankle motion; she has no motion in her toes. She does have 70 degrees of knee flexion.
Thereafter, he opined as follows:
 * * * Because of the severity of the RSD, as a result of the injury on 5-24-03 and the development of the RSD she has lost the functional use of her left lower extremity. She has a marked varus deformity in her foot, she has no ankle motion or motion in her toes; she has about 70 degrees of knee flexion; she has marked hypersensitivity; she can only ambulate either using a walker with wheels and forearm supports or occasionally in her home using a cane. She currently is on Methadone in an attempt to relieve her pain symptoms. None of these procedures have helped her, including the implantation of a spinal stimulator. Certainly the minimal function that she has as far as weight bearing in that she can, on occasion, use a cane to assist ambulation for short distances around her home, does not mean that she has a functional left lower extremity. Its function is minimal at the best and when she is not in her home because of the use of the walker and total non-weight bearing on the left lower extremity. She again has had a functional loss of use of her left lower extremity. * * *
 {¶ 9} 5. Relator's motion was heard before a district hearing officer ("DHO") on March 10, 2006, and resulted in an order denying the motion based upon the report of Dr. Kohlhaas.
 {¶ 10} 6. Relator's appeal was heard before a staff hearing officer ("SHO") on June 5, 2006, and resulted in an order affirming the prior DHO's order and denying relator's motion for the functional loss of use of her left lower extremity. The SHO stated, in relevant part:
 The Staff Hearing Officer relies on the BWC medical exam by Dr. Kohlhaas[.] * * * Dr. Kohlhaas indicates on page one of his report that he is seeing the injured worker for a loss of use exam, with emphasis on functional loss of use of the left lower extremity for all intents and purposes rather than the *Page 8 
absolute standard for an amputation or ankylosis. Therefore, the Staff Hearing Officer finds that Dr. Kohlhaas was aware of the standard being used in evaluating the injured worker's functional loss of use. Dr. Kohlhaas noted that on leaving the examination, the injured worker was able to ambulate to her vehicle without signs of hesitancy of full weight bearing on her left leg. Dr. Kohlhaas opined that she has difficulty above and beyond the usual impairment of the extremity from the allowed conditions but that this amount was "minimal" and is 5% of her left lower extremity. He opined that this converted to a 2% whole person loss of use impairment.
Thereafter, the SHO noted the newly submitted report of Dr. Ward who indicated that relator could, on occasion, ambulate very short distances using a cane. The SHO found that relator remained capable of weight bearing on her leg and of ambulating using her left leg because:
 * * * [W]alking and weight bearing is a major function of a person's lower extremity, the Staff Hearing Officer does not find sufficient proof of a loss of functional use of that lower extremity as the injured worker remains capable of weight bearing and ambulating, albeit with some difficulty.
 {¶ 11} 7. Relator's further appeal was refused by order of the commission mailed June 27, 2006. Thereafter, relator filed the instant mandamus action in this court.
Conclusions of Law: {¶ 12} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. State ex rel. Pressley v. Indus. Comm.
(1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. State ex rel. Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. On the other hand, where the record *Page 9 
contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State exrel. Lewis v. Diamond Foundry Co. (1987), 29 Ohio St.3d 56. Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. State ex rel.Teece v. Indus. Comm. (1981), 68 Ohio St.2d 165.
 {¶ 13} In State ex rel. Alcoa Bldg. Products v. Indus. Comm.,102 Ohio St.3d 341, 2004-Ohio-3166, the court succinctly set forth the historical development of scheduled loss of use awards under R.C. 4123.57(B). TheAlcoa court stated, as follows:
 Scheduled awards pursuant to R.C. 4123.57(B) compensate for the "loss" of a body member and were originally confined to amputations, with the obvious exceptions of hearing and sight. In the 1970s, two cases — State ex rel. Gassmann v. Indus. Comm. (1975), 41 Ohio St.2d 64, * * * and State ex rel. Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402 * * * — construed "loss," as similarly used in R.C. 4123.58, to include loss of use without severance. Gassmann and Walker both involved paraplegics. In sustaining each of their scheduled loss awards, we reasoned that "[f]or all practical purposes, relator has lost his legs to the same effect and extent as if they had been amputated or otherwise physically removed." Gassmann, 41 Ohio St.2d at 67[.] * * *
 {¶ 14} In Alcoa, the claimant sustained a left arm amputation just below the elbow. Continuing hypersensitivity at the amputation site prevented the claimant from ever wearing a prosthesis. Consequently, the claimant moved for a scheduled loss award for loss of use of his left arm.
 {¶ 15} Alcoa established through a videotape that the claimant could use his remaining left arm to push open a car door and to tuck paper under the arm. Nevertheless, the commission granted the claimant an award for the loss of use of his left arm. *Page 10 
 {¶ 16} This court denied Alcoa's complaint for a writ of mandamus and Alcoa appealed as of right to the Supreme Court of Ohio.
 {¶ 17} Affirming this court's judgment and upholding the commission's award, the Alcoa court explained, at ¶ 10-15, as follows:
 * * * Alcoa urges the most literal interpretation of this rationale and argues that because claimant's arm possesses some residual utility, the standard has not been met. The court of appeals, on the other hand, focused on the opening four words, "for all practical purposes." Using this interpretation, the court of appeals found that some evidence supported the commission's award and upheld it. For the reasons to follow, we affirm that judgment.
 Alcoa's interpretation is unworkable because it is impossible to satisfy. Walker and Gassmann are unequivocal in their desire to extend scheduled loss benefits beyond amputation, yet under Alcoa's interpretation, neither of those claimants would have prevailed. As the court of appeals observed, the ability to use lifeless legs as a lap upon which to rest a book is a function unavailable to one who has had both legs removed, and under an absolute equivalency standard would preclude an award. And this will always be the case in a nonseverance situation. If nothing else, the presence of an otherwise useless limb still acts as a counterweight — and hence an aid to balance — that an amputee lacks. Alcoa's interpretation would foreclose benefits to the claimant who can raise a mangled arm sufficiently to gesture or point. It would preclude an award to someone with the hand strength to hold a pack of cards or a can of soda, and it would bar — as here — scheduled loss compensation to one with a limb segment of sufficient length to push a car door or tuck a newspaper. Surely, this could not have been the intent of the General Assembly in promulgating R.C. 4123.57(B) or of Gassmann and Walker.
 Pennsylvania defines "loss of use" much as the court of appeals did in the present case, and the observations of its judiciary assist us here. In that state, a scheduled loss award requires the claimant to demonstrate either that the specific bodily member was amputated or that the claimant suffered the permanent loss of use of the injured bodily member for *Page 11 
all practical intents and purposes. Discussing that standard, one court has written:
 "Generally, the `all intents and purposes' test requires a more crippling injury than the `industrial use' test in order to bring the case under section 306(c), supra. However, it is not necessary that the injured member of the claimant be of absolutely no use in order for him to have lost the use of it for all practical intents and purposes." Curran v. Walter E. Knipe Sons, Inc. (158), 185 Pa.Super. 540, 547, 138 A.2d 251.
 This approach is preferable to Alcoa's absolute equivalency standard. Having so concluded, we further find that some evidence indeed supports the commission's decision. Again, Dr. Perkins stated:
 "It is my belief that given the claimant's residual hypersensitivity, pain, and tenderness about his left distal forearm, that he is unable to use his left upper limb at all and he should be awarded for the loss of use of the entire left upper limb given his symptoms. He has been given in the past loss of use of the hand, but really he is unable to use a prosthesis since he has had the amputation, so virtually he is without the use of his left upper limb * * *."
 {¶ 18} In the present case, the commission denied relator's motion for a scheduled loss of use of her left lower extremity based upon the report of Dr. Kohlhaas and after noting that Dr. Ward had also indicated that relator could ambulate very short distances using a cane
 {¶ 19} Relator argues that Dr. Kohlhaas' report does not constitute some evidence upon which the commission could rely. Specifically, relator argues that it is clear that Dr. Kohlhaas neither understood nor applied the appropriate standard for a loss of use award. Relator citesState ex rel. Timmerman Truss, Inc. v. Indus. Comm., 102 Ohio St.3d 244,2004-Ohio-2589, and this court's decision in State ex rel. Miller v.Indus. Comm., Franklin App. No. 05AP-214, 2005-Ohio-6371, in support of her argument. *Page 12 
However, for the reasons that follow, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion.
 {¶ 20} In Timmerman Truss, the court granted a writ of mandamus in favor of the employer where the commission had granted a loss of use award relying upon doctors' reports that did not apply the proper standard and that did not consider the claimant's actual physical abilities with respect to the body part for which the loss of use was being sought. In Timmerman Truss, the commission order awarding loss of use of the right hand was based upon Dr. Bamberger's letter and the file review of Dr. Gibson. The court found that the reports of both doctors were seriously flawed.
 {¶ 21} Dr. Bamberger's report is quoted as follows in theTimmerman Truss decision:
 "This was a significant injury and it is my opinion [that] Chad would qualify for a loss of use of the right hand. He is right-hand dominant and his employment at the time of injury involved physical labor. Based on his injury, his employment history, and the fact that this is his dominant hand, I would concur with the loss of use opinion issued by the BWC."
Id. at ¶ 10.
 {¶ 22} In finding that this report was seriously flawed, the court noted that nothing in Dr. Bamberger's report indicates that claimant's degree of loss is the functional equivalent of amputation. Instead, Dr. Bamberger recited claimant's history without discussing his current functional residuals and bases his loss of use assessment on claimant's employment history and the fact that his dominant right hand is involved. The record contained numerous statements from co-workers that all attested to claimant's resumption of his former position of employment and of other demanding outdoor *Page 13 
pursuits. The court found this to be critical because, under State exrel. Schultz v. Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316, medical evidence of disability or loss can be impeached of evidence of actual work or other physical activity inconsistent with that assessment.
 {¶ 23} Upon considering the report of Dr. Gibson, the court found that report was also flawed. Although the court found that Dr. Gibson applied the proper standard for loss of use, he failed to view his medical assessment in the context of claimant's post-recovery, physical and work activities.
 {¶ 24} In Miller, the commission had denied the claimant's request for loss of use award. The commission found that the claimant had failed to show that he had a total loss of use of his hand since the medical evidence demonstrated that he was able to move both his hand and fingers. Although this court ultimately upheld the commission's order, in examining the medical evidence contained in the record, this court pointed out a flaw in the report of Dr. Aitken. In that report, Dr. Aitken had noted the following:
 [Claimant] had his FCE which rates him as able to do light to medium activity.
 * * *
 In spite of [claimant's] FCE, I don't believe he has any significant realistic chance to rejoin the work force. This is based upon the severity of his injury, his inability to use his left hand for any significant activity, his age and training.
Id. at ¶ 8.
 {¶ 25} This court found that Dr. Aitken's reference to claimant's "inability to use his left hand for any significant activity," failed to indicate his awareness of the proper standard of loss. As such, pursuant to Timmerman Truss, this court found that Dr. *Page 14 
Aitken's report was similarly flawed and could not have been used to support a scheduled loss award.
 {¶ 26} In the present case, the magistrate finds that the flaws noted by the courts in Timmerman Truss and Miller, are not present in the instant case. Specifically, as noted in the findings of fact, Dr. Kohlhaas set out the standard to be applied at the outset of his report when he stated:
 Ms. Casey is a 49 year-old lady being seen at the request of the Mansfield BWC for a "loss of use" exam, function loss, use of left lower extremity for all intents and purposes rather then the absolute standard employed with the actual severance of a limb or ankylosis. * * *
 {¶ 27} Relator argues that, because Dr. Kohlhaas later gave a percentage of impairment relative to the injury to her hand, Dr. Kohlhaas obviously did not apply the proper standard. The magistrate does not find this to be persuasive.
 {¶ 28} At the outset of his report, Dr. Kohlhaas set forth the standard to be applied. Within the physical examination portion of his report, Dr. Kohlhaas noted that he was unable to do any testing, relative to range of motion or anything else, because relator would not take her foot out of the brace. All Dr. Kohlhaas could note was his general observation that there was no type of shiny skin or swelling of her foot and that, upon leaving, relator was able to ambulate to her vehicle without any sign of hesitancy in putting weight or full weight bearing on her left leg. Dr. Kohlhaas observed relator using her leg. While relator contends that her ability to use her leg is so minimal that it equates with a total loss of use, this argument was rejected by the commission. Furthermore, the commission also cited the additional evidence which relator had presented. Specifically, it was noted that Dr. Ward stated that relator was able to ambulate with a walker and *Page 15 
occasionally with a cane. Based upon those reports, the magistrate finds that the commission did not abuse its discretion in finding that relator had failed to demonstrate a total loss of use of her left lower extremity.
 {¶ 29} Based on the foregoing, it is this magistrate's conclusion that relator has not demonstrated that the commission abused its discretion in denying her application for total loss of use of her left lower extremity and this court should deny relator's request for a writ of mandamus. *Page 1